AUSA: Claire Sobczak    Telephone: (202) 591-5418
AO 106 (Rev. 04/10) Application for a Search Warrant   Agent:   Michael Pemberton    Telephone: (313) 670-9117

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   2:20−mc−50408-1 <br> Judge: Edmunds, Nancy G. |
| 11190 Gratiot Ave. <br> Detroit, Michigan 48213 | ) ) ) | Filed: 3/13/2020 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC§1347,18 USC§1343,18USC§1349 | Health Care Fraud, Wire Fraud, Conspiracy to Commit Health Care Fraud |
| 42USC§1320a-7b(b),21USC§841 | Illegal Remunerations, Unlawful Distribution of a Controlled Substance |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Pemberton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date:   March 13, 2020

_____
*Judge's signature*

City and state:   Detroit, MI

Hon. David R. Grand    U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

IN THE MATTER OF:
THE SEARCH OF

11190 Gratiot Ave.
Detroit, Michigan 48213

15200 Gratiot Ave.
Detroit, Michigan 48205

4673 Conner Ave.
Detroit, Michigan 48215

4600 E. 14 Mile Rd., Suite 2
Warren, Michigan 48092

1131 W. Warren Ave.
Detroit, Michigan 48201

23600 Harper Ave., Suite 101,
Saint Clair Shores, Michigan 48080

4484 Cardamon Ct.
Sterling Heights, Michigan 48314

6635 Cottonwood Knoll
West Bloomfield, Michigan 48322

7 Cabri Ln.
Dearborn Heights, Michigan 48217

50340 Nesting Ridge Dr.
Macomb, Michigan 48044

45361 Oak Forest Dr.
Northville, Michigan 48168

Case No. _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Pemberton, Special Agent for the Department of Health and Human Services, Office of the Inspector General, being duly sworn, depose and state as follows:

## INTRODUCTION

1.     I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), assigned to the Detroit, Michigan, Field Office. I joined the United States Air Force in 1995 and served nearly 13 years on active duty. In 2000, while on active duty, I graduated from the Air Force Office of Special Investigations ("AFOSI") Academy at Andrews Air Force Base, Maryland. I was an AFOSI Special Agent for the last seven years of my Air Force career. From August 2008 to June 2015, I was a Special Agent with the United States Environmental Protection Agency ("EPA"). Upon becoming an EPA Special Agent, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center at Glynco, Georgia.

2.     I have been a Special Agent with HHS-OIG since June 2015. As a Special Agent with HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343

(Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 18, United States Code, Section 371 (Conspiracy to Pay and Receive Illegal Remunerations), Title 42, United States Code, Section 1320a-7b(b) (Paying and Receiving Remunerations), Title 18, United States Code, Section 1035 (False Statements In A Health Care Matter), and Title 21, United States Code, Section 841 (Unlawful Distribution of a Controlled Substance). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses, including at medical facilities, such as pharmacies, and individuals' residences.

## PURPOSE OF THE AFFIDAVIT

3.     This affidavit is written in support of an application to search the premises of:

    a. City Drugs Pharmacy, Inc. ("City Drugs"), located at 11190 Gratiot Ave., Detroit, Michigan 48213 ("Subject Premises 1");

    b. Park Med Pharmacy LLC ("Park Med Pharmacy") and Park Medical Centers ("PMC"), each located at 15200 Gratiot Ave., Detroit, Michigan 48205 ("Subject Premises 2A" and "Subject Premises 2B," respectively; collectively, "Subject Premises 2");

    c. Conner Pharmacy LLC ("Conner") and the records storage for Eastside

3

Pharmacy, Inc. ("Eastside"), located at 4673 Conner Ave., Detroit, Michigan 48215, ("Subject Premises 3");

d.  Universal Pharmacy L.L.C. ("Universal"), located at 4600 E. 14 Mile Road, Suite 2, Warren, Michigan 48092 ("Subject Premises 4");

e.  Wayne Campus Pharmacy LLC ("Wayne Campus"), located at 1131 W. Warren Ave., Detroit, Michigan 48201 ("Subject Premises 5");

f.  Saint Clair Pharmacy LLC ("St. Clair"), located at 23600 Harper Ave., Suite 101, Saint Clair Shores, Michigan 48080 ("Subject Premises 6");

g.  the residence of Hassan Abdallah ("Abdallah"), located at 4484 Cardamon Ct., Sterling Heights, Michigan 48314 ("Subject Premises 7");

h.  the residence of Hassan Ghoul ("Ghoul"), located at 6635 Cottonwood Knoll, West Bloomfield, Michigan 48322 ("Subject Premises 8");

i.  the residence of Hassan Khreizat ("Khreizat"), located at 7 Cabri Ln., Dearborn Heights, Michigan 48217 ("Subject Premises 9");

j.  the residence of Nofal Cholag ("Cholag"), located at 50340 Nesting Ridge Dr., Macomb, Michigan 48044 ("Subject Premises 10"); and

k.  the residence of Auday Maki ("Maki"), located at 45361 Oak Forest Dr., Northville, MI 48168 ("Subject Premises 11"; collectively, "Subject Premises"), all within the Eastern District of Michigan.

4.    As discussed herein, the statements in this affidavit are based upon

4

information I learned during the investigation, information provided to me by other law enforcement agents, and my experience and background as an HHS-OIG Special Agent. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of crime, fruits of crime, contraband, and other items illegally possessed in violation of the aforementioned federal laws are located at the Subject Premises.

5.     Based on my training and experience, I know that, generally, pharmacies and doctor's offices rely upon computers to create and store data, including billing data, patient files, and claims data. For the reasons stated below, it is likely that City Drugs, PMC, Park Med Pharmacy, Conner, Eastside, Universal, Wayne Campus, and St. Clair's patient records, claims data, drug order history, billings, and other business records will be found stored on the computers and computer-like devices located at Subject Premises.

6.     As discussed herein, there is probable cause to believe that certain items and property are located within the Subject Premises, including but not limited to financial records, patient files, computers, cellular telephones, and other evidence and fruits and instrumentalities of violations of:

   A. Title 18, United States Code, Section 1347, Health Care Fraud;

B. Title 18, United States Code, Section 1343, Wire Fraud;

C. Title 18, United States Code, Section 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud;

D. Title 42, United States Code, Section 1320a-7b(b), Illegal Remunerations;

E. Title 18, United States Code, Section 371, Conspiracy to Pay or Receive Illegal Remunerations; and

F. Title 21, United States Code, Section 841, Unlawful Distribution of a Controlled Substance.

## VIOLATION STATUTES

7.     Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.     Title 18, United States Code, Section 1343, prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

9.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.

10.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

11.     Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by a federal health care benefits program as defined by 18 U.S.C. § 24(b).

12.     Title 42, United States Code, Section 1320a-7b(b)(1)(A), prohibits knowingly and willfully soliciting and receiving any remuneration (including any

7

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part by a federal health benefits program as defined by 18 U.S.C.§ 24(b).

13.     Title 18, United States Code, Section 371, prohibits conspiring to commit any offense against the United States, or to defraud the United States, or any agency thereof.

14.     Title 21, United States Code, Section 841(a)(1), provides that it is unlawful for any person to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## THE MEDICARE AND MEDICAID PROGRAMS

15.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

16.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

17.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare

Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. This investigation involves Medicare Part D, prescription drug benefits.

18.     A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan. The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

19.     CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

20.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors'

9

plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

21.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

22.    Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

23.    Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract ("MEDIC"). Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage organizations) and Part D (prescription drug coverage) programs on a national level.

24.    The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

25.    Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## **BLUE CROSS BLUE SHIELD OF MICHIGAN**

26.    Blue Cross and Blue Shield of Michigan ("BCBS") was a nonprofit, privately operated insurance company authorized and licensed to do business in the state of Michigan.  BCBS provided health care benefits, including prescription drug benefits, to member entities and individuals.  Individuals insured by BCBS were referred to as BCBS "members."

11

27.    BCBS had agreements with participating providers, including pharmacies, to furnish medical services to BCBS members.

28.    BCBS was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## SUBJECT PREMISES

### City Drugs (Subject Premises 1) and Park Med Pharmacy (Subject Premises 2A)

### City Drugs

29.    City Drugs was a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). The following information is based on publicly available documents filed with LARA on City Drugs' behalf. Maki, Mohrib Abdallah ("Mohrib"), and Raef Hamaed ("Hamaed") incorporated City Drugs on September 17, 2008. According to the Certificate of Incorporation, City Drugs' registered address was 11190 Gratiot Ave., Detroit, MI 48213, which is Subject Premises 1. City Drugs' most recent annual report was for the year 2017 and listed Maki as the Resident Agent. In 2019, Salwa Atwan ("Atwan"), President, filed a certificate of dissolution on behalf of City Drugs. According to public records and financial records the government has reviewed, Atwan appears to be Maki's spouse.

30.    During the course of my investigation, I requested records from PBMs and PSAOs for the pharmacies discussed in this affidavit. According to December 2014 and February 2017 provider certifications that City Drugs provided to Express

Scripts, a PBM, the practice address for City Drugs was Subject Premises 1, and City Drugs had been at that address since approximately 2009. The provider certifications listed Maki as the 100% owner and pharmacist-in-charge ("PIC") of City Drugs.

31.    On July 31, 2019, I received information from Robert Regan, Pharmacy Specialist, LARA Bureau of Professional Licensing ("LARA-BPL"), Pharmacy & Drug Monitoring Section, pertaining to the location of records for City Drugs. Regan provided me with a copy of an undated letter that Maki sent on behalf City Drugs to the Michigan Board of Pharmacy. City Drugs' address was listed as Subject Premises 1. The letter stated:

> Please be advised that City Drugs Pharmacy will not conduct any pharmaceutical business starting 09/01/2018. The pharmacy will be dissolved by the date mentioned. All hard copy records will be stored at the same location [*i.e.*, Subject Premises 1] and all electronic records will be transferred to Park Med Pharmacy located on 15200 Gratiot Ave Detroit, MI 48205 [Subject Premises 2A]. All medications, including control medications, will be transferred to Park Med Pharmacy as well. Please let me know if you have any questions.

32.    Below this paragraph, the letter lists Subject Premises 1 as "Old Pharmacy" and Subject Premises 2A as "New Pharmacy." Maki's signature appears at the bottom of the letter.

33.    On October 15, 2019, I verified with Jacob Poynter, LARA-BPL, that City Drugs had not provided any new information as to the location of its pharmacy records.

34.    On February 20, 2020, an FBI agent went to Subject Premises 1 and verified

the former location for City Drugs and that it was closed. On a previous visit by agents, while the front retail area of the pharmacy appeared to be empty, the agents could not see the entirety of the space.

Park Med Pharmacy

35.     Park Med Pharmacy is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Park Med Pharmacy's behalf. Park Med Pharmacy was organized on October 17, 2017. Park Med Pharmacy's articles of organization identify Maki as the resident agent. Park Med Pharmacy's 2020 annual report listed Maki as the resident agent and the registered office as Subject Premises 2A.

36.     I reviewed the July 2018 Express Scripts provider certification for Park Med Pharmacy, which listed the practice address for the pharmacy as Subject Premises 2A, and April 1, 2018 as the date the pharmacy opened for business. The provider certification lists Maki as the 100% owner and PIC of Park Med Pharmacy.

37.     On February 25, 2020, I went to Subject Premises 2A and verified that Park Med Pharmacy was located there.

**PMC (Subject Premises 2B)**

38.     PMC is a location of Park Family Health Care, P.C., which is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA. Park Family Health Care, P.C. was incorporated on

14

April 14, 1995 by Dr. Richard M. Brown. On June 25, 1998, a Certificate of Assumed name was filed for the d/b/a name of Park Medical Center. On November 13, 2018, a Certificate of Renewal of Assumed Name for the d/b/a name of Park Medical Center was filed.

39.     In February 2020, I reviewed PMC's website, www.parkmedicalcenters.com, which lists Subject Premises 2B as one of its medical offices at which providers are located.

40.     In February 2020, I reviewed information that Park Family Health Care, P.C. provided to Medicare about its practice locations, one of which is Subject Premises 2B, and its d/b/a name, which was Park Medical Center. According to this information, PMC began using Subject Premises 2B as a practice location in or around February 2017.

41.     On February 25, 2020, I went to Subject Premises 2B and verified that PMC was located there.

### Eastside and Conner (Subject Premises 3)

#### Eastside

42.     Eastside was a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Eastside's behalf. Khreizat, Hamaed, and Abdallah incorporated Eastside on January 16, 2009. The registered address for Eastside was 11854 E. Warren Ave., Detroit, MI 48215.

Eastside's most recent annual report was filed for the year 2015 and listed Hamaed as the resident agent. On November 7, 2016, a certificate of change of registered office and/or change of resident agent was filed, changing the resident agent to Abdallah.

43.     The April 2015 provider certification that Eastside provided to Express Scripts, a PBM, listed Eastside's practice address as 11854 E. Warren Ave., Detroit, MI 48215 and stated that Eastside had been at that address since approximately 2008. The provider certification listed the owners as Abdallah (50%), Hamaed (25%), and Khreizat (25%), Abdallah as the PIC, and Khreizat as a pharmacist.

44.     On May 1, 2018, I received information from Regan, LARA-BPL, pertaining to the location of records for Eastside. Regan informed me that Eastside, located at 11854 E. Warren Ave., Detroit, "was closed effective April 15, 2016" and all "records and inventory were reportedly transferred to Conner Pharmacy at 4673 Conner St., Detroit," which is Subject Premises 3.

45.     On October 15, 2019, I verified with Jacob Poynter, LARA-BPL, that LARA-BPL had no new information as to the location of Eastside's pharmacy records.

46.     On February 20, 2020, an FBI agent went to Eastside's former location and verified that Eastside closed.

Conner

47.      Conner is a registered business entity with LARA. The following information

16

is based on publicly available documents filed with LARA on Conner's behalf. Conner was organized on October 1, 2014. According to the Articles of Organization, the resident agent was Rami Zbib. On March 26, 2016, a certificate of change of registered office and/or change of resident agent was filed, changing the resident agent to Ghoul. The form listed Ghoul's title as owner. Conner's most recent annual report was filed for the year 2019 and listed Ghoul as the resident agent and the registered office as Subject Premises 3.

48.     According to the April 2016 provider certification that Conner provided to Express Scripts, a PBM, the practice address for Conner was Subject Premises 3. The provider certification listed Ghoul as the 100% owner and PIC of Conner as of approximately April 2016.

49.     On February 20, 2020, an FBI agent went to Conner and verified it is currently located at Subject Premises 3.

## Universal (Subject Premises 4)

50.     Universal is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Universal's behalf. Khreizat organized Universal on January 7, 2008. According to the Articles of Organization, Khreizat was also the resident agent. Universal's 2020 annual report listed Cholag as the resident agent and the registered office as 4600 E. 14 Mile Rd., Suite 2, Warren, MI 48092. This is Subject Premises 4.

51.    According to July 2015 and July 2018 provider certifications that Universal provided to Express Scripts, a PBM, the practice address for Universal is Subject Premises 4 since approximately April 2008. The provider certifications listed Khreizat (50%) and Cholag (50%) as the owners and Cholag as the PIC.

52.    On February 20, 2020, an FBI agent went to Universal and verified it is currently located at Subject Premises 4.

**Wayne Campus (Subject Premises 5)**

53.    Wayne Campus is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Wayne Campus's behalf. Wayne Campus was incorporated on May 18, 2011. On September 21, 2011, the Articles of Organization were amended to change the resident agent to Abdallah and a certificate of change of registered office and/or change of resident agent was filed changing the resident agent to Abdallah. Wayne Campus's most recent annual report for the year 2015 listed Abdallah as the resident agent and the registered office as 1131 W. Warren, Detroit, MI 48201. This is Subject Premises 5.

54.    According to two provider certifications that Wayne Campus provided to Express Scripts, a PBM, the practice address for Wayne Campus is Subject Premises 5 since approximately 2012. The provider certification dated April 17, 2015 listed the owners as Ali Abdelrazzaq ("Abdelrazzaq") (30%), Abdallah (18%), Kindy Ghussin (16%), Hamaed (18%), and Abeer Rizek ("Rizek") (18%); I know from

18

reviewing public records and U.S. Customs and Border Patrol Reports that Rizek is married to Tarek Fakhuri ("Fakhuri"). Abdelrazzaq was listed as the PIC. The December 12, 2017 provider certification listed Abdelrazzaq as the 100% owner and PIC. According to documents provided by LARA, Abdelrazzaq became the 100% owner in early 2017.

55.     On February 25, 2020, I and another agent went to Subject Premises 5 and verified Wayne Campus is located there. Subject Premises 5 is within a grocery store called University Foods Market.

## St. Clair (Subject Premises 6)

56.     St. Clair is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on St. Clair's behalf. According to the Articles of Organization, Ghoul organized St. Clair on July 17, 2017, Ghoul was the resident agent, and the registered office was 6635 Cottonwood Knoll, West Bloomfield, MI 48322, which is Subject Premises 8, Ghoul's home address. On December 15, 2017, a certificate of change of registered office and/or change of resident agent was filed, changing the Registered Office address to 23600 Harper Ave., Suite 101, Saint Clair Shores, MI 48080. This is Subject Premises 6. St. Clair's most recent annual report for the year 2019 listed Ghoul as the resident agent and the registered office address as Subject Premises 6.

57.     According to the provider certification that St. Clair provided to Express

Scripts, a PBM, the practice address for St. Clair is Subject Premises 6. The provided certification listed Ghoul (50%) and Mussa Mustapha (50%) as the owners and Ahmad Reslan ("Reslan") as the PIC.

58.    On February 25, 2020, I visited Subject Premises 6 and verified that it is open and operating. St. Clair is located in a one-story building that also contains a doctor's office. St. Clair has a separate entrance and space within the building.

### Hassan Abdallah's Residence (Subject Premises 7)

59.    According to Michigan Secretary of State driver's license records, Abdallah's current home address is 4484 Cardamon Ct., Sterling Heights, Michigan 48314, which is Subject Premises 7. A public records database search conducted on February 20, 2020, indicated that Abdallah's current address is Subject Premises 7.

### Hassan Ghoul's Residence (Subject Premises 8)

60.    According to Michigan Secretary of State driver's license records, Ghoul's current home address is 6635 Cottonwood Knoll, West Bloomfield, Michigan 48322, which is Subject Premises 8. A public records database search conducted on February 20, 2020, indicated that Ghoul's current address is Subject Premises 8.

### Hassan Khreizat's Residence (Subject Premises 9)

61.    According to Michigan Secretary of State driver's license records, Khreizat's current home address is listed as 7 Cabri Ln, Dearborn Heights, Michigan 48127 (Subject Premises 9). A public records database search conducted on February 20,

2020, indicated that Khreizat's current address is Subject Premises 9.

### Nofal Cholag's Residence (Subject Premises 10)

62.     According to Michigan Secretary of State driver's license records, Cholag's current home address is listed as 50340 Nesting Ridge Dr., Macomb, Michigan 48044 (Subject Premises 10). A public records database search conducted on February 20, 2020, indicated that Cholag's current address is Subject Premises 10.

### Auday Maki's Residence (Subject Premises 11)

63.     According to Michigan Secretary of State driver's license records, Maki's current home address is listed as 45361 Oak Forest Dr., Northville, Michigan 48168 (Subject Premises 11). A public records database search conducted on February 20, 2020, indicated that Maki's current address is Subject Premises 11.

### FRAUD SCHEME

64.     A common pharmacy fraud scheme is to bill Medicare, Medicaid, and other health insurers for medication that the pharmacy does not actually dispense to patients. Put another way, at a high-level, the pharmacy is submitting a higher volume of medication in claims to Medicare, Medicaid, and other insurers than it purchased during the relevant period; based on my experience and training, this is often referred to as a "shortage" scheme. This is indicative of fraud because a pharmacy cannot dispense more medications than it has purchased. Typically, although not always, Medicare and Medicaid pay significant sums for these

"shortage" medications. For example, inhalers and pain creams are common shortage medications because insurers may pay hundreds of dollars for those medications. However, pharmacies can bill but not dispense any medication. Over the course of the last four-plus years I have investigated shortage schemes, I have interviewed many patients, who have told me that both expensive and inexpensive medications (ranging from inhalers like Advair, Symbicort, QVAR, Spiriva, and HIV medication to creams and other items) were billed to Medicare, Medicaid, and other insurers that they never received from a particular pharmacy.

65.    I will provide a simplified overview of how the shortage analysis is conducted to assist the Court in evaluating this search warrant application. In general, investigating a shortage scheme involves three steps: first, agents obtain a pharmacy's drug purchase records from pharmaceutical wholesalers. Agents identify wholesalers based on financial records for the pharmacy and its owner, which identify purchases from wholesalers, and submissions from the pharmacy to state regulators and PBMs about the wholesalers used by the pharmacies; second, agents obtain Medicare and Medicaid claims data for the pharmacy; third, agents request that Qlarant conduct a shortage analysis for the time period for which it has drug purchase records and claims data.

66.    Using the pharmacy's purchase records from the wholesalers and the claims data, Qlarant will pick a representative sample of prescription medications and

compare the volume purchased with the volume dispensed in Medicare and Medicaid claims. Qlarant will then identify the volume of any shortage for each medication reviewed and the estimated amount that Medicare and Medicaid would have paid for medication billed but not dispensed. Because this analysis generally does not include claims data from any private insurers, the shortage amounts are conservative numbers because they do not incorporate any claims for that medication billed to private insurers.[1]

67.    Based on the shortage analyses performed in this investigation, the owners and operators of the aforementioned pharmacies fraudulently billed Medicare, Medicaid, and other insurers for medications that were not dispensed to beneficiaries. The pharmacies did not have sufficient drug inventory to dispense numerous expensive medications billed to Medicare and Medicaid.

68.    Pharmacies will also submit claims for medications disbursed to patients that post-date the date the patient died. Often, this is because the pharmacy has an automatic refill system in place that sends a claim to Medicare, Medicaid, and other insurers after a certain time period has passed since the prior fill of that prescription. However, whether a prescription is an automatic refill or not, if a patient does not

---

[1] However, because Blue Cross Blue Shield ("BCBS") is a major health insurance company in Michigan, once Qlarant determines which medications were short, BCBS is often asked to provide the sum that it paid on claims that pharmacy submitted for the shortage medications.

pick up a prescription, the pharmacy is obligated to reverse the claim within a certain time. In my training and experience, pharmacies committing fraud often submit claims for beneficiaries who are already dead and never reverse them. The pharmacies involved in this investigation submitted post-death claims.

69.     The owners/operators of the aforementioned pharmacies submitted false and fraudulent claims through interstate wires from Michigan to Medicare, Medicaid, and other insurers. The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Michigan.

## PROBABLE CAUSE FOR SUBJECT PREMISES
### Cooperating Witnesses

70.     Cooperating Witness 1 ("CW-1") is known to agents and pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-1 has not yet been sentenced. CW-1 owned a pharmacy and pleaded guilty stemming from a scheme in which CW-1's pharmacy billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions at CW-1's pharmacy. I interviewed CW-1 in March 2017 and February 2020. CW-1 provided the following information based on conversations CW-1 had with Abdallah.

71.     CW-1 knows Abdallah. They had multiple conversations, including some as

recently as 2016, about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-1 that Abdallah owned Conner, Eastside, a pharmacy near Wayne State University, a pharmacy in Ohio that he had sold, another pharmacy that he opened in Ohio, and another pharmacy on Gratiot Avenue next to Dr. Eduardo Abellana's ("Dr. Abellana") office. CW-1 also stated that City Drugs sounded familiar as a pharmacy that Abdallah owned. I know from records I have reviewed in this case that Wayne Campus is located near Wayne State University, and that Abdallah sold his interest in a pharmacy in Ohio in approximately 2012 or 2013 and subsequently opened a different pharmacy in Ohio. In addition, documents obtained from the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") and documentation that Dr. Abellana provided to Medicare indicated that, around the time of CW-1's interview, Dr. Abellana had an office at 11180 Gratiot Ave, located next to Subject Premises 1.

72. Abdallah told CW-1 that Abdallah partnered with different individuals for his pharmacies, including Hamaed and individuals named Tarek and Auday, which are Fakhuri and Maki's first names, respectively. Abdallah told CW-1 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated that he tried to conceal his shortages by keeping enough inventory and invoices to cover an

invoice review by the PBM for which the pharmacy billed through the most.

73.    Abdallah also told CW-1 that he sold opioid prescriptions for cash.

74.    Cooperating Witness 2 ("CW-2"), a relative of CW-1, is known to agents and pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-2 has not yet been sentenced. CW-2 owned a pharmacy and worked at a different pharmacy and pleaded guilty stemming from a scheme in which these pharmacies billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions these pharmacies. I interviewed CW-2 in March 2017 and February 2020 and CW-2 provided the following information based on conversations CW-2 had with Abdallah.

75.    CW-2 knows Abdallah. They had multiple conversations between 2010 and 2014 about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-2 that Abdallah partnered with different individuals for his pharmacies, including Hamaed, Fakhuri, and Maki. Abdallah stated that he owned Conner, Eastside, a pharmacy by Wayne State University, and another pharmacy in a doctor's office. As stated above, City Drugs was located next to Dr. Abellana's office. Abdallah told CW-2 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication without reversing the claims. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated

that he tried to conceal his shortages by keeping enough inventory and invoices to cover an invoice review by the largest PBM. He told his partners to do this as well. Abdallah stated that he filled narcotics prescriptions for cash; whether he did this at all of his pharmacies or only a subset is not known at this time. Abdallah stated that he closed and opened pharmacies on multiple occasions to avoid detection.

76.     Abdallah also discussed with CW-2 the amount for which he could sell opioid prescriptions in cash.

## City Drugs

### Qlarant Invoice Reconciliation

77.     I requested drug purchase records and received responses from the pharmaceutical wholesalers used by City Drugs, which are listed below. I furnished all of the wholesaler records and Medicare and Medicaid data that I received to Qlarant and requested an invoice review for the period of January 1, 2011 through February 5, 2018. Qlarant compared invoices for City Drugs' drug purchases to Medicare and Medicaid claims data for this period.

78.     On April 30, 2018, Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:** Anda, Cardinal Health-Harvard Drug Group, Cardinal Health-ParMed, and McKesson

**Date Range of Invoice Review:** 1/1/2011 – 2/5/2018

**Number of Drugs Reviewed:** 55

**Total Number of Drugs Short to Medicare:** 53

**Total Number of Drugs Short to Medicaid:** 35

**Approximate Loss to Medicare:** $2,097,515.71

**Approximate Loss to Medicaid:** $1,598,038.72

**Approximate Combined Loss to Medicare and Medicaid:** $3,695,554.43.

79.    Qlarant provided the following summary of City Drugs' top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Aug Betamet Oin 0.05% | $470,539.14 |
| QVAR AER 80MCG | $404,986.69 |
| Advair Disku Aer 250/50 | $312,128.60 |
| QVAR Aer 40MCG | $242,648.93 |
| Lyrica Cap 75MG | $234,808.72 |
| Spiriva Cap handihlr | $212,459.12 |
| Abilify Tab 5MG | $174,927.31 |
| Lantus Inj 100/ml | $152,177.48 |
| Symbicort Aer 160-4.5 | $150,730.51 |
| Triumeq Tab | $135,948.68 |

80.    In sum, Qlarant concluded that City Drugs' inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 53 of the 55 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid City Drugs approximately $3,695,554.43 for medications that City Drugs did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Augmented Betamethasone Ointment, QVAR (inhaler), Advair Disku (inhaler), and Lyrica.

28

BCBS Shortage at City Drugs

81.    On May 30, 2018, based on the Medicare and Medicaid shortage medications

identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS

paid $42,872.61 in claims submitted by City Drugs for those shortage medications

over the same period as Qlarant's analysis.

Billing for Deceased Beneficiaries at City Drugs

82.    I conducted a review of the Medicare Part D claims data and Medicaid claims

data for City Drugs, which revealed that City Drugs billed for medication

purportedly dispensed to beneficiaries after they were deceased. Between

approximately 2011 and January 2016, City Drugs submitted 13 claims for

medications purportedly dispensed to beneficiaries after their dates of death.

Beneficiary Interview

83.    In November 2019 and January 2020, I interviewed P.M., a Medicaid

beneficiary who picked up prescriptions at City Drugs. Claims data reflects P.M.

purportedly received prescriptions from 2010 to 2012 and 2016 to 2018. P.M.

identified Maki as the pharmacist at City Drugs. P.M. stated that s/he did not receive

all of the medication that City Drugs billed to his/her Medicaid insurance.

84.    For example, P.M. only received Lyrica once. It had severe side effects

the first time P.M. took it so s/he never took it again. However, between April 2016

and March 2018, City Drugs billed P.M.'s Medicaid insurance for Lyrica

approximately 19 times. Lyrica is one of the shortage medications that Qlarant identified.

85.     As a second example, P.M. stated that s/he only needed an Albuterol inhaler but received others from City Drugs that s/he did not need. P.M. received about six or seven inhalers in 2018. However, in 2018, City Drugs actually billed P.M.'s Medicaid insurance for 18 inhalers. Approximately half of City Drugs' top ten shortage medications are inhalers.

86.     As a third example, P.M. stated that s/he never received Acyclovir. Nevertheless, between May 2016 and May 25, 2018, City Drugs billed P.M.'s Medicaid insurance for Acyclovir approximately 19 times, with Dr. Abellana listed as the prescribing physician. P.M. recalled that Dr. Abellana did initially prescribe it but, before P.M. picked it up, P.M. looked it up and saw that it was for herpes. P.M. saw another doctor who stated that P.M. did not have herpes. P.M. subsequently confronted Dr. Abellana. S/he did not pick up the medication from City Drugs.

## PMC

87.     Evidence obtained during the course of the investigation supports that Dr. Abellana is part of the fraud scheme described in this affidavit. As stated above, Dr. Abellana's office used to be located next to City Drugs. MDHHS-OIG determined that, from January 2009 to September 2015, Dr. Abellana was responsible for 75% of all prescriptions filled at City Drugs. When City Drugs closed, Maki opened Park

Med Pharmacy in the same building as PMC. According to information that PMC provided to Medicare through the Provider Enrollment, Chain, and Ownership System, the PMC location next to City Drugs closed in or around October 2017. The PMC location next to Park Med Pharmacy opened earlier in 2017. According to data that I have reviewed, from July 2017 through June 2019, Dr. Abellana was responsible for prescriptions constituting approximately 66% of the amount that Park Med Pharmacy received from Medicare. In this same period, the next two pharmacies that received the greatest amount of Medicare reimbursements from Dr. Abellana's prescriptions were Conner and another pharmacy that Maki incorporated.

88.     As noted above, information provided to Medicare stated that Dr. Abellana is practicing in Subject Premises 2B. In addition, I called PMC on February 20, 2020 and verified that Dr. Abellana practices at Subject Premises 2B. The individual I spoke to at PMC also confirmed that Dr. Abellana's old practice address was 11180 Gratiot Ave., Detroit, Michigan.

89.     CW-2 stated that Abdallah told him/her that Abdallah paid kickbacks to Dr. Abellana of $5 per prescription.

90.     As stated above, Dr. Abellana prescribed Conner patient P.M. Acyclovir, which was medically unnecessary and never filled. Nevertheless, Conner submitted 19 claims for Acyclovir, which Dr. Abellana noted as the prescribing doctor in the claims data.

91.     Medicaid beneficiary K.M. was interviewed in December 2019 and January 2020. K.M. stated that s/he used to get prescriptions filled at City Drugs. Claims data indicates that K.M. purportedly received prescriptions from City Drugs in 2010, 2012, and 2014 to 2018. K.M. stated that s/he had never saw Dr. Abellana and never received any of the prescriptions allegedly written by Dr. Abellana as set forth in City Drugs' claims data. City Drugs' claims data shows 54 prescriptions supposedly written by Dr. Abellana and filled between May 2010 and January 2018.

92.     Medicare beneficiary L.S. was a patient of Dr. Abellana, City Drugs, and Park Med Pharmacy. Claims data indicates that L.S. purportedly received prescriptions from City Drugs from 2011 to 2018, including with Dr. Abellana as the prescribing doctor in 2011 and from 2013 to 2018, and from Park Med Pharmacy from 2018 to 2019, including with Dr. Abellana as the prescribing doctor in 2018 and 2019. L.S. is P.M.'s significant other. L.S. stated that when he was at City Drugs, Dr. Abellana called the pharmacist at City Drugs to tell the pharmacist what to fill. L.S. was not part of this conversation. L.S. subsequently received medication s/he did not want or need, including inhalers, which L.S. told Maki. Moreover, L.S. continued to receive medications s/he did not need, some of which he returned to the pharmacy. These claims were not reversed. L.S.'s insurance was also billed for medication that L.S. never received, including inhalers, and Lyrica.

93.     I reviewed L.S.'s Medicare data and confirmed that Dr. Abellana was the

prescribing doctor for the vast majority of L.S.'s prescriptions at City Drugs from February 2013 to January 2018 and at Park Med Pharmacy from August 2018 to October 2019.

## Eastside

## Qlarant Invoice Reconciliation

94.    I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Eastside, which are listed below. I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 3, 2011 through April 22, 2016. Qlarant compared invoices for Eastside's drug purchases to Medicare and Medicaid claims data for this period.

95.    On May 2, 2018, Qlarant finalized its invoice review of Eastside and provided the following summary:

**Wholesalers with Supportive Invoices:** Anda, Auburn, Cardinal Health-Harvard Drug Group, Cardinal Health-ParMed, Match Rx, McKesson, Quest, and Trxade

**Date Range of Invoice Review:** 1/3/2011 – 4/22/2016

**Number of Drugs Reviewed:** 109

**Total Number of Drugs Short to Medicare:** 79

**Total Number of Drugs Short to Medicaid:** 14

**Approximate Loss to Medicare:** $2,079,423.21

**Approximate Loss to Medicaid:** $396,481.88

33

**Approximate Combined Loss to Medicare and Medicaid:** $2,475,905.09.

96.     Qlarant provided the following summary of Eastside's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Tab 10 Mg | $393,488.36 |
| Spiriva Cap handihlr | $237,323.21 |
| Advair Disku Aer 250/50 | $195,705.69 |
| Renvela Tab 800 Mg | $133,315.15 |
| Seroquel XR Tab 300 Mg | $107,694.04 |
| Symbicort Aer 160-4.5 | $95,233.55 |
| Abilify Tab 5MG | $71,275.48 |
| Lantus Inj 100/ml | $70,590.37 |
| Abilify Tab 15 Mg | $64,727.63 |
| Seroquel XR Tab 200 Mg | $64,475.56 |

97.     In sum, Qlarant concluded that Eastside's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 79 of the 109 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Eastside approximately $2,475,905.09 for medications that Eastside did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify, Spiriva Can Handihlr (inhaler), Advair Disku (inhaler), and Renvela.

<u>BCBS Shortage for Eastside</u>

98.     On May 30, 2018, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $196,910.15 in claims submitted by Eastside for those shortage medications

34

over the same period as Qlarant's analysis.

## Billing for Deceased Beneficiaries at Eastside

99.    I conducted a review of the Medicare Part D claims data and Medicaid claims data for Eastside, which revealed that Eastside billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately January 2010 and December 2015, Eastside submitted 145 claims for medications purportedly dispensed to beneficiaries after their dates of death.

## Beneficiary Interview

100.   In October 2019 and January 2020, I interviewed D.R., a Medicare beneficiary who picked up prescriptions at Eastside.   Claims data reflects prescriptions supposedly dispensed to D.R. from at least 2011 until the spring of 2016. D.R. identified Abdallah as the owner and person who ran Eastside. D.R. stated that s/he did not receive all of the medication that Eastside billed to his/her Medicare and Medicaid insurance.

101.   As an example, D.R. stated that s/he switched from Advair to Spiriva at some point and never received both of them at the same time. D.R. stated that if s/he were billed for both, D.R. did not receive the Advair. D.R.'s Medicare data indicates that Eastside submitted claims for Advair monthly from February 2011 to October 2011 and then Spiriva monthly from August 2014 to March 2016. In February 2015, Eastside resumed submitting claims for Advair, which D.R. did not receive.

35

Qlarant's shortage analysis identified Advair as one of Eastside's largest shortage medications.

102.   As another example, D.R. stated that s/he did not receive Proair inhalers. Nevertheless, from January 2011 to March 2016, Eastside submitted claims for 64 Proair inhalers. Qlarant identified Proair as a shortage medication at Eastside.

## Universal

### Michigan Medicaid Invoice Reconciliation

103.   In 2016, the Michigan Department of Health and Human Services—Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Universal for the period January 1, 2013, through January 31, 2016. MDHHS-OIG's invoice review compared Universal's drug purchases to its Medicaid billing for this period. MDHHS-OIG determined that Universal had a shortage of a number of medications that resulted in a loss to Medicaid of $262,421.31. MDHHS-OIG typically reviews only claims submitted to Medicaid and not to Medicare.

### Qlarant Invoice Reconciliation

104.   During the MDHHS-OIG invoice review, Universal told MDHHS-OIG which pharmaceutical wholesalers it used. MDHHS-OIG provided me with Universal's drug purchase records utilized in its invoice review of Universal for the above-stated period.

105.   The records provided by MDHHS-OIG contained drug sale or purchase

36

records from the pharmaceutical wholesalers listed below.

106.   I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 2, 2013, through January 29, 2016. Qlarant compared invoices for Universal's drug purchases to both Medicare and Medicaid claims data for this period.

107.   On November 2, 2018, Qlarant finalized its invoice review of Universal and concluded the following:

**Wholesalers with Supportive Invoices:** Anda (VIP), Auburn Pharmaceutical, H&H Wholesale, Harvard Drug Group, Keysource, Masters Rx, Match Rx, McKesson, Payless Distributors, and Top Rx

**Date Range of Invoice Review:** 1/2/2013 – 01/29/2016

**Number of Drugs Reviewed:** 81

**Total Number of Drugs Short to Medicare:** 64

**Total Number of Drugs Short to Medicaid:** 7

**Approximate Loss to Medicare:** $1,236,281.05

**Approximate Loss to Medicaid:** $168,873.48

**Approximate Combined Loss to Medicare and Medicaid:** $1,405,154.53

108.   Qlarant provided the following summary of Universal's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
| --- | --- |
| Lidocaine Oin 5% | $193,156.01 |
| Lidoderm Dis 5% | $112,441.82 |
| Spiriva Cap Handihlr | $98,631.45 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Nexium Cap 40 Mg | $92,624.69 |
| Advair Disku Aer 250/50 | $70,685.50 |
| Lantus inj 100/Ml | $57,935.51 |
| Abilify Tab 5 Mg | $52,959.48 |
| Symbicort Aer 160-4.5 | $52,068.19 |
| Celebrex Cap 200 Mg | $48,831.01 |
| Advair Disku Aer 500/50 | $48,504.79 |

109.   In sum, Qlarant concluded that Universal's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 64 of the 81 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Universal approximately $1,405,154.53 for medications that Universal did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Lidocaine Ointmer, Lidoderm Dis, and Spiriva Cap Handihlr (inhaler).

## BCBS Shortage for Universal

110.   On May 29, 2019, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $97,813.54 in claims submitted by Universal for those shortage medications over the same period as Qlarant's analysis.

## Billing for Deceased Beneficiaries at Universal

111.   I conducted a review of the Medicare Part D claims data and Medicaid claims data for Universal, which revealed that Universal billed for medication purportedly

dispensed to beneficiaries after they were deceased. Between approximately October 2010 and April 2017, Universal submitted 56 claims for medications purportedly dispensed to beneficiaries after their dates of death.

### Beneficiary Interview

112.   In January 2020, I interviewed P.H., a Medicare beneficiary who picked up prescriptions at Universal. Claims data reflects that P.H. purportedly received prescriptions form Universal from at least 2013 into 2018, which is the entirety of the period for which the government has Universal's Medicare claims data. P.H. identified Khreizat and Cholag as pharmacists at Universal. P.H. stated that s/he did not receive all of the medication that Universal billed to his/her Medicare insurance.

113.   For example, P.H. identified and showed agents the three inhalers s/he has used. P.H. stated that s/he has never received a Tudorza inhaler, which Universal billed to Medicare 11 times from March 2015 to January 2016. Qlarant did not include Tudorza in its shortage analysis.

114.   As another example, P.H. stated that s/he never received Proair, which Universal billed to Medicare five times between May 2016 and October 2016. Qlarant identified Proair as a shortage medication for Universal.

115.   As a third example, P.H. stated that s/he never received Ketoconazole, which Universal billed to Medicare ten times from October 2017 to August 2018. Qlarant did not include Ketoconazole in its shortage analysis.

39

## **Wayne Campus**

### Qlarant Invoice Reconciliation

116.   I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Wayne Campus, which are listed below. I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 20, 2012 through December 31, 2016. Qlarant compared invoices for Wayne Campus's drug purchases to Medicare and Medicaid claims data for this period.

117.   On February 28, 2020, Qlarant finalized its invoice review of Wayne Campus and provided the following summary:

> **Wholesalers with Supportive Invoices:** Alpine, Auburn, Cardinal, and McKesson
>
> **Date Range of Invoice Review:** 1/20/2012 – 12/31/2016
>
> **Number of Drugs Reviewed:** 85
>
> **Total Number of Drugs Short to Medicare:** 51
>
> **Total Number of Drugs Short to Medicaid:** 2
>
> **Approximate Loss to Medicare:** $324,699.07
>
> **Approximate Loss to Medicaid:** $856.51
>
> **Approximate Combined Loss to Medicare and Medicaid:** $325,555.58.

118.   Qlarant provided the following summary of Wayne Campus's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

40

| Drug Name | Approx. Dollar Loss |
|---|---|
| Truvada Tab 200-300 | $38,737.72 |
| Spiriva Cap Handihlr | $34,116.76 |
| Renvela Tab 800 Mg | $27,067.43 |
| Reyataz Cap 300 Mg | $24,928.74 |
| Lidoderm Dis 5% | $20,820.00 |
| Symbicort Aer 160-4.5 | $18,522.54 |
| Abilify Tab 10 Mg | $15,074.99 |
| Seroquel XR Tab 400 Mg | $10,012.96 |
| Lantus Solos Inj 100/ml | $9,202.89 |
| Advair Disku Aer 250/50 | $9,130.93 |

119.   In sum, Qlarant concluded that Wayne Campus's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 51 of the 94 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Wayne Campus approximately $325,555.58 for medications that Wayne Campus did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Truvada, Spiriva Cap Handihlr (inhaler), and Renvela.

<u>Billing for Deceased Beneficiaries at Wayne Campus</u>

120.   I conducted a review of the Medicare Part D claims data and Medicaid claims data for Wayne Campus, which revealed that Wayne Campus billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately January 2012 and March 2018, Wayne Campus submitted 58 claims for medications purportedly dispensed to beneficiaries after their dates of death.

41

<u>Beneficiary Interview</u>

121.   In January 2020, I interviewed B.B., a Medicaid beneficiary who filled his/her prescriptions at Wayne Campus. Claims data reflects prescriptions supposedly dispensed to B.B. since at least 2014. B.B. identified Abdelrazzaq as the pharmacist at Wayne Campus. B.B. stated that s/he did not receive all of the medication that Wayne Campus billed to his/her Medicaid insurance.

122.   B.B. stated that s/he knew which medications s/he received and s/he knew s/he did not receive all of the medications Wayne Campus billed to Medicaid. B.B. stated that s/he never received Dulera or QVAR inhalers from Wayne Campus. Nevertheless, in June 2015, Wayne Campus submitted a claim for a Dulera inhaler and, in July 2015, Wayne Campus submitted a claim for a QVAR inhaler.

## **Conner**

<u>Qlarant Invoice Reconciliation</u>

123.   I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Conner, which are listed below. I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of April 18, 2016 through September 12, 2019. Qlarant compared invoices for Conner's drug purchases to Medicare and Medicaid claims data for this period.

124.   On February 28, 2020, Qlarant finalized its invoice review of Conner and provided the following summary:

**Wholesalers with Supportive Invoices:** Alpine Health, Alvix Laboratories LLC, Amerisource Bergen, Anda, Atlantic, Auburn, Bellco, Bonita, Cardinal, Dynasty, H&H, IPC, KY Meds, Masters, Match Rx, Matrix, McKesson, Pharmasource, Prescription Supply, PriMed, Quest, River City, South Pointe, Wasatch, and Wellgistics.

**Date Range of Invoice Review:** 4/18/2016 – 9/12/2019

**Number of Drugs Reviewed:** 77

**Total Number of Drugs Short to Medicare:** 35

**Total Number of Drugs Short to Medicaid:** 0

**Approximate Loss to Medicare:** $96,764.88

**Approximate Loss to Medicaid:** $0.00

**Approximate Combined Loss to Medicare and Medicaid:** $96,764.88

125. Qlarant provided the following summary of Conner's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Main Inj 400mg | $12,821.08 |
| Spiriva Cap Handihlr | $6,596.42 |
| Humalog Mix Inj 75/25kwp | $6,176.16 |
| Renvela Tab 800mg | $5,420.41 |
| Advair Disku Aer 500/50 | $5,362.41 |
| Invega Sust Inj 234/1.5 | $5,244.08 |
| Advair Disku Aer 250/50 | $4,868.99 |
| Enbrel Srclk Inj 50mg/ml | $4,818.91 |
| Seroquel XR Tab 300mg | $4,813.47 |
| Aripiprazole Tab 10mg | $3,996.78 |

126. In sum, Qlarant concluded that Conner's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least

35 of the 77 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Conner approximately $96,764.88 for medications that Conner did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify Main Inj 400 mg, Spriva Cap Handihlr (inhaler), and Humalog Mix Inj (HIV medication).

## Billing for Deceased Beneficiaries at Conner

127.   I conducted a review of the Medicare Part D claims data and Medicaid claims data for Conner, which revealed that Conner billed for medication purportedly dispensed to beneficiaries after they were deceased. During 2018, Conner submitted four claims for medications purportedly dispensed to a beneficiary after his/her date of death.

## Beneficiary Interview

128.   D.R., the Medicare beneficiary discussed with regard to Eastside, became a patient of Conner once Eastside closed in 2016. Claims data reflects that D.R. supposedly received prescriptions from Conner from 2016 to 2019, the end of the period for which the government has claims data. D.R. stated that the same individuals worked at Conner as at Eastside. D.R. stated that, like at Eastside, D.R. did not receive all of the medication that Conner billed to his/her Medicare insurance.

129.   As an example, even though D.R. stated that s/he never received Proair, from April 2016 to July 2019, Conner submitted 35 claims to Medicare.

130. As another example, in October 2019, D.R. reviewed with me his/her Medicare Explanation of Benefits form from the previous month, September 2019, which listed all of the medications for which Conner had submitted claims to Medicare. D.R. identified multiple medications s/he did not receive, including Lidocaine cream and an Albuterol inhaler.

### St. Clair

Qlarant Invoice Reconciliation

131. I requested drug purchase records and received responses from the pharmaceutical wholesalers used by St. Clair, which are listed below. I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of March 4, 2018 through September 12, 2019. Qlarant compared invoices for St. Clair's drug purchases to Medicare and Medicaid claims data for this period.

132. On November 22, 2019, Qlarant finalized its invoice review of St. Clair and provided the following summary:

> **Wholesalers with Supportive Invoices:** Akron, Amerisource Bergen, Auburn, Bonita, Cardinal, Colossal Health, Dynasty, H&H, Hercules, Independent, Masters, McKesson, Medmax, Paragon, Pharmox, Prescription Supply, PriMed, Quest, Republic, River City, Smith Drug and Integral, South Pointe, Taiga, Wasatch, and Wellgistics.
>
> **Date Range of Invoice Review:** 3/04/2018 – 9/12/2019
>
> **Number of Drugs Reviewed:** 33
>
> **Total Number of Drugs Short to Medicare:** 9

**Total Number of Drugs Short to Medicaid:** 1

**Approximate Loss to Medicare:** $83,961.88

**Approximate Loss to Medicaid:** $2,138.38

**Approximate Combined Loss to Medicare and Medicaid:** $86,100.26.

133.   Qlarant provided the following summary of St. Clair's top drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Hydrocortiso Oin Absorbas | $54,528.73 |
| Doxepin Hcl Cre 5% | $11,170.18 |
| Omepra/Bicar Cap 40-1100 | $8,059.92 |
| Enbrel Srclk inj 50 Mg/Ml | $5,119.96 |
| Vimpat Tab 100 Mg | $2,723.14 |
| Symbicort Aer 160-4.5 | $1,688.74 |
| Xarelto Tab 15 Mg | $1,238.61 |
| Diclofenac Gel 3% | $1,038.36 |
| Oxymorphone Tab 15 Mg ER | $532.62 |

134.   In sum, Qlarant concluded that St. Clair's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least nine of the 33 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid St. Clair approximately $86,100.26 for medications that St. Clair did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Hydrocortisone Oin Absorbas, Doxepin Hcl, and Omepra/Bicar Cap.

## BCBS Shortage for St. Clair

135.   On December 10, 2019, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $2,826.78 in claims submitted by St. Clair for those shortage medications over the same period as Qlarant's analysis.

## Beneficiary Interview

136.   In March 2020, I interviewed a D.A., a Medicare beneficiary who picked up prescriptions at St. Clair. Claims data reflects that D.A. purportedly received prescriptions from St. Clair in 2018 and 2019. D.A. identified Reslan as the pharmacist at St. Clair. D.A. stated that s/he did not receive all of the medication that St. Clair billed to his/her Medicare insurance.

137.   As an example, D.A. stated that s/he never received Hydrocortisone in Absorbase, an ointment, from St. Clair. Nevertheless, from April 2018 to October 2018, St. Clair submitted five claims for Hydrocortisone in Absorbase, for which Medicare paid approximately $1,069.50 per prescription. Qlarant identified this as St. Clair's top shortage medication.

## **Park Med Pharmacy**

## Qlarant Invoice Reconciliation

138.   I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Park Med Pharmacy, which are listed below. I

furnished all of the wholesaler records I received to Qlarant and requested an invoice

review for the period of July 2, 2018 through October 11, 2019. Qlarant compared

invoices for Park Med Pharmacy's drug purchases to Medicare and Medicaid claims

data for this period.

139.   On December 12, 2019, Qlarant finalized its invoice review of Park Med

Pharmacy and provided the following summary:

> **Wholesalers with Supportive Invoices:** Anda, Capital, Cardinal, Global,
> Independent, IPC, Keysource, McKesson, Pharmasource, Redmond and
> Greer, and Surplus Diabetic.
>
> **Date Range of Invoice Review:** 7/02/2018 – 10/11/2019
>
> **Number of Drugs Reviewed:** 23
>
> **Total Number of Drugs Short to Medicare:** 4
>
> **Total Number of Drugs Short to Medicaid:** 1
>
> **Approximate Loss to Medicare:** $8,487.41
>
> **Approximate Loss to Medicaid:** $3,474.67
>
> **Approximate Combined Loss to Medicare and Medicaid:** $11,962.09

140.   Qlarant provided the following summary of Park Med Pharmacy's top drug

shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| HC Valerate Cre 0.2% | $5,684.15 |
| Megestrol AC Sus 40 Mg/Ml | $4,668.35 |
| Lidocaine Oin 5% | $1,383.69 |
| Lyrica Cap 200 Mg | $225.90 |

141.   In sum, Qlarant concluded that Park Med Pharmacy's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least four of the 23 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Park Med Pharmacy approximately $11,962.09 for medications that Park Med Pharmacy did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were HC Valerate Cre 0.2%, Megestrol AC Sus 40 Mg/Ml, and Lidocaine Oin 5%.

### Billing for Deceased Beneficiaries at Park Med Pharmacy

142.   I conducted a review of the Medicare Part D claims data and Medicaid claims data for Park Med Pharmacy, which revealed that Park Med Pharmacy billed for medication purportedly dispensed to beneficiaries after they were deceased. During 2019, Park Med Pharmacy submitted 10 claims for medications purportedly dispensed to a beneficiary after his/her date of death.

### Beneficiary Interview

143.   In November 2019 and January 2020, I interviewed a L.S., a Medicare beneficiary who picked up prescriptions at Park Med Pharmacy. As stated above, claims data reflects that L.S. purportedly received prescriptions from Park Med Pharmacy in 2018 and 2019. L.S. identified Maki as the pharmacist at Park Med Pharmacy. L.S. stated that s/he did not receive all of the medication that Park Med

49

Pharmacy billed to his/her Medicare insurance.

144.   As an example, L.S. stated that s/he never received Ketoconazole cream from Park Med Pharmacy. Nevertheless, from August 2018 to October 2019, Park Med Pharmacy submitted 15 claims for Ketoconazole cream.

**Probable Cause for Abdallah's Residence (Subject Premises 7)**

145.   On October 17, 2019, I conducted a trash pull at Subject Premises 7, which revealed the following:

- A check deposit receipt from The Local Credit Union into an account ending with 7620 held by "Pharmacy Consulting Group LLC" ("Pharmacy Consulting Group"). Abdallah electronically signed the receipt.

146.   On October 31, 2019, I conducted a trash pull at Subject Premises 7, which revealed the following:

- A check torn in four pieces from Pharmacy Consulting Group dated October 16, 2019 written to Abdallah for $10,000.00.

147.   Throughout the course of the investigation, I obtained and reviewed bank records from Conner and learned that Conner paid the Pharmacy Consulting Group over $767,000.00 from July 2016 to July 2019, around the end of the period for which the government obtained bank records. The deposits from Conner constituted almost the entirety of the deposits into this Pharmacy Consulting Group account, aside from a few relatively small deposits from Abdallah himself.

148.   Pharmacy Consulting Group is a registered business entity with LARA. According to its Articles of Organization, Pharmacy Consulting Group was organized on June 13, 2016. Abdallah was the resident agent and the registered office is Subject Premises 7. Pharmacy Consulting Group's 2020 annual report lists Abdallah as the resident agent and the registered office as Subject Premises 7. In addition, I reviewed bank records for an account held by Pharmacy Consulting Group dating from June 2016 to January 2020. The address used was Subject Premises 7 and the business email address listed on the account application was hassanrph@yahoo.com.

149.   In addition, CW-2 told me that in around 2016, he was at Abdallah's house and Abdallah showed him a box about a foot long and a foot tall that was filled with cash that Abdallah made by selling the narcotics discussed in paragraphs 73 and 75 above. Abdallah told CW-2 that he planned to use the cash to buy a laundromat.

150.   Based on my training and experience, I believe that Hassan Abdallah conducts business in regard to Conner from Subject Premises 7.

## Probable Cause for Ghoul's Residence (Subject Premises 8)

151.   On October 8, 2019, I conducted a trash pull at Subject Premises 8, which revealed the following:

- An open envelope from Independent Pharmacy Cooperative.

51

- An open envelope from Alpha Tax addressed to Conner, 4673 Conner Street, Detroit, MI 48215.

152.   On January 7, 2020, I conducted a trash pull at Subject Premises 8, which revealed the following:

- A reconciliation report from Express RX Returns remitted to Conner, 4673 Conner, Detroit, Michigan 48215.

- An Express RX Returns invoice for Conner, 4673 Conner, Detroit, MI 48215.

- A check from Inmar Rx Solutions to Conner for $195.49.

- Multiple prescription slips with handwritten notes and numbers on them.

153.   Financial records and wholesaler records reviewed in this case indicate that Independent Pharmacy Cooperative is one of Conner's pharmaceutical wholesalers.

154.   Based on my training and experience, I know that Express Rx Returns is a pharmaceutical reverse distributor, which, generally speaking, are companies that purchase unused medications from pharmacies and dispose of them. I also know that Inmar Rx Solutions is a pharmaceutical intermediary for pharmacies.

155.   I conducted a review of the trash collected from Subject Premises 8 on January 7, 2020, specifically with regard to the prescription slips with handwritten notes and prescription numbers. These handwritten notes had similar messages on them and essentially had messages stating for one prescription number to see another prescription number. For example, one of the notes I reviewed had the writing, "for

Rx #871108 see Rx # 871097."

156. Based on my training and experience, I know that it is possible to locate specific prescription claims data based on a prescription number, including for Medicare, Medicaid, and private insurance claims. I conducted a review of the Medicare claims data for Conner and compared them to a handful of the handwritten notes referencing prescription numbers. The prescription numbers in the handwritten notes found in the trash from Subject Premises 8 matched prescription numbers in Conner's Medicare claims data. Out of the handful of handwritten notes examined, I was able to match up three of the handwritten notes with prescription numbers to specific claims Conner billed to Medicare.

157. Prescription numbers 871108 and 871097 were Medicare claims Conner submitted for beneficiary D.R., whose interview is discussed earlier in this affidavit. Prescription 871108 was for Lidocaine Ointment 5 that was purportedly dispensed on May 11, 2018. Prescription 871097 was for Diclofenac Tab 75 MG DR, that was purportedly dispensed on April 12, 2018.

158. Further, the government obtained bank records for Conner Pharmacy through July 2019 and Ghoul through June 2019. Ghoul regularly received checks written to him from Conner Pharmacy into July 2019.

159. Based on my training and experience, I believe that Hassan Ghoul conducts business in regard to Conner from Subject Premises 8.

## Probable Cause for Khreizat's Residence (Subject Premises 9)

160.   On October 2, 2019, I conducted a trash pull at Subject Premises 9, which revealed the following:

- A torn up American Express Delta rewards credit card statement addressed to Sam Khreizat ending in account number 4-84006 reflecting purchases from Auburn Pharmaceutical on September 4, 2019.

161.   I know from beneficiary interviews and records reviewed in connection with this investigation that Khreizat goes by Sam.

162.   Financial records and wholesaler records reviewed in this case indicate that Auburn Pharmaceutical is one of Universal's pharmaceutical wholesalers.

163.   Throughout the course of my investigation, I obtained and reviewed credit card records for an American Express Delta rewards credit card account ending in 4-84006. The credit card statements were addressed to Khreizat at Subject Premises 9. The credit card records reflect multiple purchases from Auburn Pharmaceutical.

164.   On October 9, 2019, I conducted a trash pull at Subject Premises 9, which revealed the following:

- An open envelope from Independent Pharmacy Cooperative.

165.   On October 8, 2019, I conducted a trash pull at Subject Premises 9, which revealed the following:

- An open envelope from Independent Pharmacy Cooperative.

54

- A Costco catalog addressed to Universal with the address of Subject Premises 9.

166. As stated above, Independent Pharmacy Cooperative is a pharmaceutical wholesaler.

167. I also reviewed statements from Merrill Lynch regarding a retirement account Universal established for Khreizat's benefit. Statements from this account are addressed to "Universal Pharmacy Sep FBO Sam Khreizat" at Subject Premises 9.

168. Further, the government obtained bank records for Conner and Universal through July 2019. Khreizat received regular payments from Conner and Universal, as recently as July 2019.

169. Based on my training and experience, I believe that Hassan Khreizat conducts business with regard to Universal from Subject Premises 9.

**Probable Cause for Cholag's Residence (Subject Premises 10)**

170. On October 10, 2019, I conducted a trash pull at Subject Premises 10, which revealed the following:

- Multiple blank Universal labels and drug instruction labels.

- A torn up empty box of Mupirocin Ointment from Universal prescribed to patient I.M.

- A torn up box of medication with a Universal label on it.

- A torn up pharmacy label from Universal for Exemestane prescribed to patient I.T.

- A torn up label from Universal for Januvia prescribed to patient A.S.

171. On January 9, 2020, I conducted a trash pull at Subject Premises 10, which revealed the following:

- Approximately eight banker boxes full of empty pharmacy medication dispensing containers, many of which have a "UNIVERSAL" sticker on them.

- 15 patient prescription pill bottles with prescription labels partially torn off, some of which read "Universal Pharmacy." On one of these, the patient name is scribbled off but is still legible. The patient has the initials S.H. The label also has an address and phone number for the patient.

172. Based on my review of Universal's bank records into July 2019, Cholag regularly received payments from Universal, including as recently as July 2019.

173. Based on my training and experience, I believe that Nofal Cholag conducts business for Universal at Subject Premises 10.

### **Probable Cause for Maki's Residence (Subject Premises 11)**

174. On November 13, 2019, I conducted a trash pull at Subject Premises 11, which revealed the following:

- A piece of mail from Prevagen addressed to City Drugs, 45361 Oak Forest Dr., Northville, MI 48168.

56

- A piece of mail from Capital One Spark Business addressed to City Drugs, Attn: Auday Maki, 45361 Oak Forest Dr., Northville, MI 48168.

175.  Prevagen is a dietary supplement often found at pharmacies.

176.  On January 8, 2020, I conducted a trash pull at Subject Premises 11, which revealed the following:

- Two documents from the National Plan and Provider Enumerator System regarding a new National Council for Prescription Drug Programs ("NCPDP") number for City Drugs dated November 14, 2008. One of the documents appears to be a printout of an email from NCPDP to Maki's email address, audaymaki@yahoo.com.

177.  Pharmacies are required to obtain a NCPDP number in order to dispense medication.

178.  The fact that one of the documents appears to be a printout of an email indicates that Maki used email to conduct business with regard to City Drugs.

179.  On January 15, 2020, I conducted a trash pull at Subject Premises 11, which revealed a financial offer from Capital One Spark Business addressed to City Drugs, Attn: Auday Maki, 45361 Oak Forest Dr., Northville, MI 48168.

180.  I reviewed bank records for Park Med Pharmacy into August 2019. Maki regularly received payments from Park Med Pharmacy, including as recently as July 2019.

57

181.   Based on the items recovered from the trash pulls at Maki's house related to City Drugs and my training and experience, I believe that Auday Maki conducted business for City Drugs at Subject Premises 11.

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

182.   It has been your Affiant's experience and training that, generally, business offices rely upon computers to create and store data, including billing data. It is likely that the providers' insurance billing and patient records, documents, and materials will be found stored on computers in their respective offices (Subject Premises 1-6). In addition, from my training and experience, I know that emails, pharmacy software systems, and claims submission software can often be accessed from any computer with an internet connection, even computers not physically located at the pharmacy.

183.   According to Express Scripts pharmacy credentialing documents, Health Business Systems ("HBS") was the software vendor for Conner, Eastside, City Drugs, and Park Med Pharmacy. On February 20, 2020, I spoke to a representative of HBS and learned that Transaction Data Systems ("TDS") acquired HBS. The TDS representative informed me that the TDS software had remote access capability for customers. TDS customers could request remote access from TDS and, upon approval, could access TDS pharmacy software remotely. TDS customers with remote access privileges could access the TDS software system remotely (*e.g.*, from a laptop).

184.   According to Express Scripts pharmacy credentialing documents, SRS Systems was the software vendor for St. Clair Pharmacy. According to the SRS Systems website, www.srspharmacy.com, SRS Systems' software for pharmacies appears to include remote access. On March 20, 2020, SRS representatives told me that customers can opt for remote access, which can be enabled on any laptop or desktop. This capability has been available for about ten years.

185.   I reviewed the documents below relating to the use of computers by the pharmacies and individuals above.

| Indiv. | Pharm. | Date | Type of Doc. | Summary |
|--------|--------|------|--------------|---------|
| Maki | City Drugs | 2/24/17 | Express Scripts (PBM) Provider Certification signed by Maki | Includes name of software vendor. States that City Drugs maintains electronic patient profiles. Email address under "Business Information" is "audaymaki@yahoo.com." |
| Ghoul | Conner | 4/1/16 | Express Scripts (PBM) Provider Certification signed by Ghoul | Includes name of software vendor. States that Conner maintains electronic patient profiles and is equipped to submit claims electronically. Email address for the contact person, Ghoul, is "connerpharmacy@yahoo.com." |
| Abdallah | Eastside | 4/10/15 | Express Scripts (PBM) Provider Certification signed by Abdallah | Includes name of software vendor. States that Eastside maintains electronic patient profiles and is equipped to submit claims electronically. |
| Maki | Park Med Pharmacy | 7/31/18 | Express Scripts (PBM) Provider Certification signed by Maki | Includes name of software vendor. States that Park Med Pharmacy maintains electronic patient profiles and is equipped to submit claims electronically. Email address for |

| Indiv. | Pharm. | Date | Type of Doc. | Summary |
|--------|--------|------|--------------|---------|
| | | | | primary point of contact, Maki, is audaymaki@yahoo.com. |
| Maki | | 1/9/19 | Email from Maki to Express Scripts (PBM) | Email chain between Maki (audaymaki@yahoo.com) and Express Scripts in which Maki states that he does not own another pharmacy. |
| Ghoul | St. Clair | 12/8/17 | Express Scripts (PBM) Provider Certification signed by Ghoul | Includes name of software vendor. States that St. Clair maintains electronic patient profiles and is equipped to submit claims electronically. Email address for the contact person, Reslan, the PIC, is "saintclairpharmacy@yahoo.com." |
| Cholag | Universal | 7/5/18 | Express Scripts (PBM) Provider Certification signed by Cholag | Includes name of software vendor. States that Universal maintains electronic patient profiles and does e-prescribing. Email address under "Business Information" is "universalpharmacy@live.com." |
| Abdelrazzaq | Wayne Campus | 12/12/17 | Express Scripts (PBM) Provider Certification signed by Abdelrazzaaq | Includes name of software vendor. States that Wayne Campus maintains electronic patient profiles and does e-prescribing. |
| Khreizat | Universal | 2/13/16 | Emails with MDHHS-OIG | Emails between Khreizat with universalpharmacy@live.com and MDHHS-OIG regarding overpayment. |
| Abdelrazzaq | Wayne Campus | 6/28/13 | Emails with MDHHS-OIG | Emails between Abdelrazzaq with aliabdelrazzaq@yahoo.com and LARA regarding inspection. |

186.  In addition, I have reviewed in documents that have been submitted on behalf of the pharmacies described in the affidavit that have included the following additional email addresses as contact information:

60

   a.  Abdallah: hassanrph@yahoo.com

   b.  Cholag: nofalcholag@yahoo.com

   c.  Ghoul: ghoulpharmd@yahoo.com

   d.  Khreizat: ac1351@hotmail.com

   e.  Park Med Pharmacy: parkmed15200@gmail.com

187.   The open pharmacies, Conner, St. Clair, Wayne Campus, Universal, and Park Med, continue to use computers to submit claims, which may be part of the scheme described in this affidavit. Agents reviewed Medicare claims data for February 2020 for those pharmacies, which included claims for prescriptions allegedly dispensed in mid-February 2020.

<u>Cellular Phones</u>

188.   In February 2020, I interviewed K.S., who worked at Heartland Pharmacy ("Heartland") and Heartland Pharmacy 2 ("Heartland 2"), both of which were located in Ohio, beginning in October 2018. K.S. identified Kindy Ghussin ("Ghussin") as the main owner at both of these pharmacies. As stated above, Ghussin was an owner of Wayne Campus. Ghussin told K.S. that Ghussin had partners from Michigan for both Heartland and Heartland 2. K.S. stated that the Michigan partners came to Heartland one afternoon. K.S. identified a photograph of Hamaed as one of the Michigan partners who came that day. Ghussin told K.S. that he could not make decisions without his Michigan partners and that he had to deal with them constantly.

K.S. frequently heard Ghussin on his phone discussing business.

189. I have reviewed PBM certifications for Heartland and Heartland 2 that Ghussin signed. The 2014 and 2016 certifications for Heartland indicate that Abdallah, Ghussin, Hamaed, and Rizek were each 25% owners. The 2018 certification indicates that Abdallah (33%), Ghussin (34%), and Hamaed (33%) owned Heartland. The 2014 certification for Heartland 2 indicated that Ghussin (33.34%), Abdallah (33.33%), and Hamaed (33.33%) owned Heartland 2. Qlarant also conducted analysis of Heartland and Heartland 2 and determined that each pharmacy had a shortage.

190. Throughout the course of this investigation, I identified cellular phone numbers used by the subjects of the investigation through review of PBM and audit records, public records, and other means. I obtained cellular phone toll records pertaining to phone numbers used by Abdallah, Khreizat, Maki, Ghoul, and Hamaed. Records received from the phone providers in February 2020 indicated the following:

> a. According to records from T-Mobile, Abdallah's cell phone number appears to be (586) 662-0050. The T-Mobile subscriber name was "S Pharmacy Consulting Group LLC." The subscriber address was Subject Premises 7, which is Abdallah's house. The MSISDN name was "Abdallah." The billing details indicated the company name was Pharmacy

Consulting Group LLC at Subject Premises 7. A review of tolls between February 26, 2018 and February 26, 2020 indicate that Abdallah's cell phone had a number of contacts with the phone numbers associated with Ghoul and Hamaed. Specifically, between March 2018 and February 2020, Abdallah had approximately 7,172 contacts with Ghoul. Specifically, between February 2018 and February 2020, Abdallah had 184 contacts with Hamaed.

b.  According to records from T-Mobile, Khreizat's cell phone number appears to be (313) 729-6373. The T-Mobile subscriber name was Farah Darwiche and the address was Subject Premises 9, Khreizat's residence. The subscriber information also indicated "SC FAM UNL TT+D 4 lines incl." in the rate plan description. My review of public records indicate Khreizat co-owned Subject Premises 9 with Darwiche. A review of public records, banking records, and real estate records indicates that Farah Darwiche is Khreizat's wife. A review of tolls between February 26, 2018 and February 26, 2020 indicate Khreizat's cellular phone had multiple contacts with Cholag and Universal Pharmacy. Specifically, between February 2018 and February 2020, Khreizat had approximately 1,615 contacts with Cholag and 226 contacts with Universal Pharmacy.

c.  According to records from Verizon Wireless, Ghoul's cell phone number

63

appears to be (313) 999-2543. The Verizon Wireless subscriber name was Ghoul and address was Subject Premises 8, Ghoul's residence. A review of tolls was conducted between October 8, 2012 to February 5, 2020. Ghoul's cellular phone had 2,813 contacts with Abdallah between September 3, 2014 and January 30, 2020, 2,344 contacts with Mustapha between October 8, 2012 and February 5, 2020, 259 contacts with Khreizat between October 27, 2012 and January 22, 2020, and 244 contacts with Cholag between October 13, 2012 and October 21, 2019. There were also 357 contacts between Ghoul's cellular phone and Saint Clair between January 2, 2018 and February 14, 2020.

d. According to records from Verizon Wireless, Maki's cell phone number appears to be (313) 443-1781. The Verizon subscriber name was Auday Maki at Subject Premises 11, Maki's residence. A review of tolls was conducted between October 10, 2016 to February 5, 2020. From March 2017 to February 2020, Maki's cell phone had approximately 45 contacts with City Drugs. From May 2018 to October 2019, Maki's cell phone had approximately 12 contacts with Park Med Pharmacy. From April 2018 to May 2019, Maki's cell phone had approximately six contacts with Khreizat.

191. MDHHS-OIG obtained an employee list for Universal during their audit in

2016, which listed the phone numbers for Khreizat and Cholag. The analyses of the cellular phone numbers above indicates these numbers were used to contact each other (Khreizat and Cholag), Ghoul, and the subject pharmacies involved in the fraud scheme.

192.   Based on my training and experience and the information set forth above, I believe that Abdallah, Khreizat, Maki, Ghoul, Hamaed, and Cholag were conducting business using their cellular phones.

193.   For the reasons stated above, there is probable cause to believe that one or more computers at the Subject Premises were used to generate false billings and contain information including records, documents, and materials relating to these crimes.

194.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (computer personnel) will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data. If computer personnel determine that these items cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

195.   If the computer personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

196.   Authority is sought to search any computer related equipment capable of creating and/or storing information in electronic or magnetic form for the items listed in Attachment B. "Computer related equipment" refers to:

- Computer hardware, consisting of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots" or personal data assistants, "tablet" computing devices, smartphones, iPods or other similar media devices, memory facsimile machines, and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related

communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

- Computer software, that is, digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

- Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or

code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

- Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, and software and instruction manuals.

197.   If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.

198.   Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIAL INSTRUCTION REGARDING REVIEW OF THE SEIZED MATERIAL

199. With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

200. If, during the review of the seized material, the review team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

201. Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## CONCLUSION

202. Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title

18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 42, United States Code, Sections 1320a-7(b) (Illegal Remunerations), Title 18, United States Code, Section 371 (Conspiracy to Pay or Receive Illegal Remunerations), and Title 21, United States Code, Section 841 (Unlawful Distribution of a Controlled Substance).

## REQUEST FOR SEALING

203.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.


Michael Pemberton, Special Agent
HHS-OIG


Sworn to before me and signed in my
presence and/or by reliable electronic means.

Hon. David R. Grand
United States Magistrate Judge

Dated:  March 13, 2020

## ATTACHMENT A – PREMISES TO BE SEARCHED

Premises to be searched are:

### Subject Premises 1

Subject Premises 1, depicted below, is located at 11190 Gratiot Ave, Detroit, MI 48213, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a single-story building composed of beige/grey siding, and there is a sign that reads "City Drugs Pharmacy" in red and yellow lettering on the front of the building. A sign near the entrance of the parking lot to the business reads "City Drugs, (313) 521-4000, 11190 Gratiot, Pharmacy" in red, black, and white. The business is located on the east side of Gratiot Avenue across from the intersection of Gunston Avenue and Gratiot Avenue. The business is attached or adjoins another business called "Gentle Dental."





**<u>Subject Premises 2</u>**

Subject Premises 2, depicted below and consisting of Subject Premises 2A and 2B, is located at 15200 Gratiot Avenue, Detroit, Michigan 48205, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a single-story building composed of brick. A blue awning is above the entrance, which reads, "15200 Park Medical Centers Walk-ins Welcome." There is a sign near the entrance to the parking lot that reads, "15200 Park Medical Centers, 313-924-8495, Walk In Family Medicine, Most Insurance accepted." Park Medical Centers is Subject Premises 2B. The business is located on the east side of Gratiot just north of Bringard Drive and South of Edmore Drive.



**<u>Subject Premises 3</u>**

Subject Premises 3, depicted below, is located at 4673 Conner Avenue, Detroit, Michigan 48224, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is in a strip mall comprised of multiple businesses. The building is composed of brick and beige stucco or building material. Signs are located on two sides of the building that read "Conner Pharmacy." The business is located next to Tax One Income Tax Services. The business is located on the southwest side of Conner Avenue between East Forest Avenue and East Canfield Street.

74



**<u>Subject Premises 4</u>**

Subject Premises 4, depicted below, is located at 4600 East 14 Mile Road, Suite 2, Warren, Michigan 48092, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The address is a single story building composed of brick. A sign above the front door reads "Universal HealthMart Pharmacy." Another sign on the side of the building that reads "Universal HealthMart Pharmacy." The door on the side entrance reads "Universal Pharmacy." The business is located on the south side of East 14 Mile Road between Ryan Road and Mound Road.





**<u>Subject Premises 5</u>**

Subject Premises 5, depicted below, is located at 1131 West Warren Avenue, Detroit, Michigan 48201, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is in a strip mall comprised of multiple businesses. The building is composed of brick and has a green roof. A sign located above the main entrance reads "University Foods Market," and another sign on the building reads Health Mart Pharmacy. The business is located on the south side of West Warren Avenue between Trumbull Avenue and the John C Lodge Service Drive. On February 25, 2020, an FBI agent and I visited Subject Premises 5 and observed that

the pharmacy is located in a separate area within University Foods Market. Authority is sought to search only the areas within Subject Premises 5 that contain pharmacy records.







**<u>Subject Premises 6</u>**

Subject Premises 6, depicted below, is located at 23600 Harper Avenue, Suite 101, Saint Clair Shores, Michigan 48080, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The address is a single story building with brick beige siding/building material. A sign on the front of the building reads, "Saint Clair Pharmacy Open To The Public." The business is located on the east side of Harper Avenue between Pleasant Street and Lakeview Street. The pharmacy is located immediately to the right when entering the building through the rear parking lot and is labeled Suite 101. Authority is sought to search only the areas within Subject Premises 6 that contain pharmacy records.





**<u>Subject Premises 7</u>**

Subject Premises 7, depicted below, is located at 4484 Cardamon Court, Sterling Heights, MI 48314, and all buildings, structures, and appurtenances thereof. This address is located in residential area surrounded by other residential structures. It is a residence with an attached garage. The two-story house has a brick exterior. The subject address is located on Cardamon Court west of Cardamon Drive.



**<u>Subject Premises 8</u>**

Subject Premises 8, depicted below, is located at 6635 Cottonwood Knoll, West Bloomfield, MI 48322, and all buildings, structures, and appurtenances thereof. This address is located in residential area surrounded by other residential structures. It is a residence with an attached garage. The address is a two-story residence with brick and beige siding. The number 6635 is displayed above the garage. The subject address is located off an offshoot of Cottonwood Knoll between Perham Drive and Deerfield Village Drive called Cottonwood Court.





**<u>Subject Premises 9</u>**

Subject Premises 9, depicted below, is located at 7 Cabri Lane, Dearborn Heights, MI 48217, and all buildings, structures, and appurtenances thereof. This address is located in residential area surrounded by other residential structures. It is

a residence with an attached garage. The two-story house has a brick exterior. The number "7" is displayed to the right of the main entrance on a column. The subject address is located on a gated street that requires a passcode. The subject address is located on the south side of Cabri Lane and east of Beech Daly.



**<u>Subject Premises 10</u>**

Subject Premises 10, depicted below, is located at 50340 Nesting Ridge Drive, Macomb, MI 48044, and all buildings, structures, and appurtenances thereof. This address is located in residential area surrounded by other residential structures. It is a residence with an attached garage. The two-story house has a brick exterior. The numbers "50340" are displayed above the door. The subject address is located on

the east side of Nesting Ridge Drive between Vesper Drive and Sally Ann Drive.



**<u>Subject Premises 11</u>**

Subject Premises 11, depicted below, is located at 45361 Oak Forest Drive, Northville, MI 48168, and all buildings, structures, and appurtenances thereof. This address is located in residential area surrounded by other residential structures. It is a residence with an attached garage. The two-story house has a brick and siding exterior. The subject address is located on the south side of Oak Forest Drive between Crystal Downs Drive East and Aspen Valley Drive.



## ATTACHMENT B – ITEMS TO BE SEIZED

For the following time periods:

| Subject Premises | Associated Pharmacy(ies)/Individuals | Time Period |
|---|---|---|
| Subject Premises 1 | City Drugs | 2009 to Dec. 2018 |
| Subject Premises 2A | City Drugs & Park Med | 2009 to Jan. 2019 (City Drugs) Apr. 2018 to present (Park Med) |
| Subject Premises 2B | Park Medical Center | 2009 to present |
| Subject Premises 3 | Eastside & Conner | 2009 to Dec. 2016 (Eastside) Apr. 2016 to present (Conner) |
| Subject Premises 4 | Universal | Apr. 2008 to present |
| Subject Premises 5 | Wayne Campus | Sept. 2011 to present |
| Subject Premises 6 | St. Clair | 2017 to present |
| Subject Premises 7 | Abdallah | Apr. 2008 to present |
| Subject Premises 8 | Ghoul | Apr. 2008 to present |
| Subject Premises 9 | Khreizat | Apr. 2008 to present |
| Subject Premises 10 | Cholag | Apr. 2008 to present |
| Subject Premises 11 | Maki | 2009 to present |

Any and all of the following items concerning or related to any individual or entity who is reasonably believed to be part of the pharmacy scheme. This information may be stored or filed and includes any format in which the information may exist, including the media of hard copy, computer hard disc, digital storage devices, and computer discs:

1. All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, physician notes, nursing notes, medical assistant notes, and original patient or referral source listings.

2. All documents constituting, concerning, or relating to bills, invoices, and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3. All financial and tax-related books, records, and documents related in any way to the above persons or businesses, including, without limitation:

   a. Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

   b. Credit/Automatic Teller Machine/debit card accounts;

   c. All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

   d. All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

   e. All information relating to the purchase, titling, and insurance of vehicles, real estate, and other assets, including safe deposit boxes and keys;

   f. All financial statements, accounts payable/receivable, and credit reports.

4. All records relating to the ordering, maintenance, or dispensing of controlled substances or other medications, and any and all non-controlled and controlled substances in Schedules II, III, IV, and/or V.

5. Documentation of all patient appointments or scheduling and patient sign-in sheets.

6. All documents consisting, concerning or relating to all current and former employees, including personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense

reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements, and W-2 forms.

7. All documents constituting, concerning or relating to work diaries, calendars, logs, appointment books, and schedules.

8. All records related to any payments made to patients or others to induce patients to seek treatment from any of the above referenced individuals or businesses.

9. All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or businesses.

10. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or businesses, and any other individual, company, physician, or billing company.

11. All Medicare handbooks, manuals, newsletters or other Medicare publications.

12. Records of control over other areas such as storage units where financial, medical, or other billing records may be maintained.

13. Records of control of the premises and things described, namely, utility bills, telephone bills, rent, or lease records pertaining to or evidencing ownership or control of the premises to be searched.

14. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including floppy discs, compact discs, other data storage discs or tapes, or thumb or flash drives. Any electronic storage media, including cellular telephones, pagers, electronic organizers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant. When data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

15. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of, any computer equipment which contains any of the aforesaid information.

16. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws, and annual reports.

17. All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

18. Currency or other items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

19. Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

\*\*\*

20. Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

   a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

   b. If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

   c. If the computer personnel determine it is not practical to perform on-site searching, copying, or imaging (due to time, technical, or other considerations), then the computer equipment and storage devices will

be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth herein.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    i. Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

    ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

    iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units,

removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines, and/or other media that is capable of storing magnetic coding;

iv.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.    Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

vii.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

The terms records, documents, communications, and applications, includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form (such as tape recordings,

cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage.

91

AUSA:   Claire Sobczak        Telephone:  (202) 591-5418

AO 93  (Rev. 11/13) Search and Seizure Warrant        Agent:        Michael Pemberton        Telephone:  (313) 670-9117

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| In the Matter of the Search of | ) | | |
|---|---|---|---|
| *(Briefly describe the property to be searched* | ) | | |
| *or identify the person by name and address)* | ) | Case No. | 20-50408-1 |
| 11190 Gratiot Ave. | ) | | |
| Detroit, Michigan 48213 | ) | | |
| | ) | | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before    March 27, 2020 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     March 13, 2020   6:07 pm _____        _____
                                                                                *Judge's signature*

City and state:     Detroit, MI _____        Hon. David R. Grand    U. S. Magistrate Judge
                                                                                *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*